Good morning, Your Honors, and may it please the Court, my name is John Cotton. I'm counsel for the appellants Terrence Coxon and World Money Managers. The facts in this case are quite old. They began, frankly, back during the first Bush administration in 1989, and the procedure brought this case to trial in 1997. No decision was issued by the administrative law judge until 1999, and four years later there was an appeal heard by the SEC from which we have come to this Court today. There really is only one issue before the Court today, and this issue is before the Court as the last place it has any chance of being reviewed, practically speaking, and that is an issue of disgorgement amount. It's a very long record in terms of the opinion of the ALJ and the SEC. We've got almost 82 pages of factual findings, conclusions of law, over 100 footnotes, some fairly complex, specific, and sometimes overlapping statutory violations that, frankly, sometimes even confuse me when I go back and read the record in terms of how many there were. We're not here to challenge the findings of responsibility, the findings of violations. We're only here to talk about the disgorgement, and there are three things we raise to this Court in our brief. It's important to note that in terms of disgorgement, because of the length of time, which I've already emphasized, and in particular the length of time between the trial in this matter and the appeal being heard four years after the opinion and six years after the trial, there's a substantial amount of prejudgment interest accrued in this case. For every dollar of disgorgement that could be removed from the order of the SEC, there's approximately 55 cents of disgorgement attached to each dollar, which would make, for example, one of the issues we're raising today, which we call the commissions, the trailing commissions issue, which was approximately $290,000 of alleged wrongful ill-gotten gains. That number would certainly get bigger. In fact, it would become somewhere around $440,000 of the total award when you look at the interest. The issues have been well briefed by the parties, and I think that they are well before the Court. I have a few comments I want to make in response to the SEC's brief, since we didn't file a reply brief. First, the SEC has raised the issue in their brief of whether or not the argument that we've raised about the absolution of one of the Respondents from any responsibility was timely brought before this Court and whether it should have been raised to the SEC. I concede that that is a strong argument that the commission has made, and I only want to say to this Court that, again, because of the passage of time between the trial and the actual appeal and then decision in 2003, it seemed at the time to be, if another hearing was held before the SEC, it ran a substantial risk of a lot more interest being run up. It seemed to come to this Court, would be a much more expeditious method. Number two, we had no concern, or maybe I should say we had concern, but we did not challenge the decision of the commission on Mr. Sergi. It was a compassionate and humanitarian act. I believe the commission must have had evidence in front of it to give it the basis for that decision. What we felt happened, however, was that that compassion had a spillover effect on the result to the other two Respondents in terms of what they must pay in disgorgement. And we viewed at the time the issue not to be one of a rehearing, which is what the commission says to this Court we should have asked for. We actually thought what we were looking at is a question of whether we had any opportunity to file for a motion for some form of reconsideration. But typically for reconsideration you need either newly discovered facts or a change in the law. We weren't going to challenge the decision on Mr. Sergi. It was unclear whether by making such a motion for reconsideration we'd be able to accomplish anything. Second, the case that the commission cites, Gearhart and Otis, I just want to point out that case by the D.C. Circuit is a case in which, because of the jurisdictional impediment of one Commissioner being seated who perhaps shouldn't have heard the case because he hadn't been sworn in, the entire proceeding was said to be void and what they were seeking was a rehearing of the whole matter. We never would have been seeking a rehearing of the whole matter. We would have only been trying to figure out what to do with the absolution, if you will, of Mr. Sergi. It's hard to see. Take me through the steps on which you think that would have affected the discouragement award. I'm sorry, Your Honor, I didn't hear that. Take me through the steps on how you think that would have affected the discouragement award against your client. Against the other two Respondents?  Well, that's a very good question and one I've pondered, but I don't have an easy answer to it because it's hard. I mean, if they had prosecuted, you would not have been automatically entitled to offset. Right? I think that's correct. The issue becomes one of collection. And I frankly, and I don't mean to be boastful, I've been practicing in the area with the SEC for most of my career, and I don't recall ever seeing an issue either reported or in practice on how collection of these discouragements will occur. And we raised issues in our brief about the possibility of an indemnity argument, contribution argument, between one Respondent to the other, and the commission citing the Stratosphere case said, no, that's simply not the way it's going to work. In effect, we, the SEC, can go after any one Respondent for the entire amount. It's joint and several. And I understand that legal argument. But I struggle with it from an equitable standpoint, since discouragement is equitable, because it would mean that the SEC would have discretion to go after the least well-heeled, the least funded Respondent to get the entire amount and leave two or three others, you know, without any relief being sought. Therefore, it's hard to answer the question, because I don't know how they would collect or propose to collect. Clearly, the sensible, equitable thing is to take a one-third from each one, to ask each one to contribute their one-third. And if they don't. That's not the nature of joint and several liability. Excuse me? That's not the nature of joint and several liability. It isn't from a legal standpoint, in terms of liability. I'm trying to focus on collection, which is where I struggle. And I don't have any cases or any law to understand how that would work. Because, again, that would leave it to the Commission's discretion to simply pick one Respondent and try to get it all out of that Respondent. Legally, the case law says you're responsible, along with the others. We can go after you for all of it. It troubles me that that's the case. And in particular, it troubles me here when we have such a large amount of prejudgment interest on the other two Respondents, and in effect, we still, and I'm going to get to this point, we still have to look at this Circuit's standard in the Hadley decision where there needs to be a reasonable approximation. It was pretty easy to approximate what happened when they let Mr. Cergi out. One-third of the obligation, in mathematical terms, was being let out, because there was no other allocation by the Commission. So let's assume he went bankrupt, which could happen, or he died and he had no estate. You'd still, you'd have to pay the full amount, right? That is correct, Your Honor. That would become, that, however, would trigger at the collection point, because the SEC could not collect, typically, from a bankrupt. I don't want to quibble with the hypothetical, but these are not dischargeable. These are not dischargeable in bankruptcy. They may not be collectible if one party is bankrupt, yes, but they're not dischargeable if they're based on a fraud finding. Kennedy, I mean, if this individual was ill, not in good financial shape or died, and he didn't, there weren't any assets, you'd be stuck for the full amount. That is correct, Your Honor. And I will point out there are only four lines in the 52, excuse me, the 32-page opinion of the Commission dealing with Mr. Cergi. They do not say that he was out of money. They don't say anything about his financial circumstances. And, again, while it's compassionate and it may have been merited in some respects based on medical health, it wasn't based on economics, and it gets me back to my collection point. You know, the problem, though, I think from our perspective, and you can give me yours on that, is that to reach even the initial gap on that, we have to put ourselves in the executive branch, and we are, in a sense, reviewing their prosecutorial discretion, which raises a separation of powers issue. Conceitedly, it does. And there is a lot of discretion for the prosecutors to pick their targets and to pick their charges. Here, however, they've made the choice. They've gotten the case tried. They've gotten a joint and several award. Now we're back to the question of how do you collect it. What kind of discretion do you use in collecting it? We also raised, as I said, there are three sub-issues on disgorgement. We raised two others. The second one that we raised had to do with what we call the 12B1 marketing expense issue. I will, again, confess to this Court, even after living with this case for eight years, it is a complicated issue. The Commission correctly points out in their brief that we incorrectly characterized the SEC as finding that my two clients violated Section 12B1, which is that section of the Investment Company Act that says a mutual fund can have a marketing plan as long as the board approves of it. They're correct. The finding was that my clients aided and abetted a violation of 12B1, and they directly violated Section 34, I believe it's 34B of the Investment Company Act. But I think that's a distinction without great significance because it gets us to the same place on marketing expenses. I have found in no reported case, administrative or in the Federal circuits, that tells us what a marketing expense for a mutual fund is. That is to say, what constitutes the acceptable categories of expenses can you have in a marketing expense? Now, a lot of this case consumed the issue of whether transfer agent fees, auditor fees, and certain other fees were of two characters. They both could contribute towards advertising and marketing by bringing in more investors, or they could be operational expenses that every business has to undergo. What I think you will find when you look at the record in this case is that the ALJ and the SEC and the Division of Enforcement's expert all conceded that these fees, these transfer agent and auditor fees, have two characters. And without being trite, they remind me of the old breath mint candy mint advertisement with the dichotomy. Can they be both? Are they one at one time and one at the other time? And what we are asking for here, and this, by the way, is a $121,000 piece of the disgorgement which would come up to $170,000 with prejudgment interest. We're saying that the investment advisor, in recommending to the board in a written plan, in a written request for reimbursement, told the board what they were asking payment for. They said, we're asking for these transfer agent fees and these auditing fees as part of our 12B1 marketing expenses. The board approved it, and the respondents in this case, the appellants,  Now, the commission says you can't get there because you didn't give the board all the information they needed. It wasn't a fully vetted issue before the board. You didn't tell them one thing. You didn't tell them that one of the audit staff told you, told one of you, one of the respondents, Mr. Sergi, that when they booked those transfer agent fees in the amount they did, that they were being aggressive. And by bootstrapping that comment by one of the audit team up to the two respondents and then saying you should have told the board that the audit team found it aggressive, the commission says the disclosure wasn't fulsome. The board didn't give full and fair approval. Therefore, you committed a violation of both the anti-fraud rule under the Investment Company Act and the Investment Advisors Act. Our remedy is you've got to disgorge this $121,000. Now, one confusing point. The number of $121,000 is one-half of a larger number, and that number was cut in half because there had been, as part of the marketing plan, a written proposal to the shareholders and the board that world money managers, the respondent, would only pick up one-half of these marketing fees. The other half would be picked up by the fund. That's why the commission cut that in half, and we incorrectly questioned why they did that in our brief. I now see why they did that. It was mathematically consistent with the marketing plan. The last point we wanted to make under the issue of the disgorgement was what we call the overcapitalization issue and the trailing commissions. Very simply, I find no case, certainly nothing against the point that we want to make, that says the commission should not consider the money that comes into the alleged scheme or the alleged wrongful taking that offsets the amount that was allegedly ill-gotten. We have evidence in the record. It's not disputed, and the administrative law judge and the commission recognized it in their brief, I'm sorry, in their opinion, that approximately $290,000 of commissions came back into World Money Securities from the sale of the products that they spent money on. This is unique. And it was outspent. Excuse me? It was outspent. It came in out of the expense. It was some of the expense. That's correct. Well, that is correct, except it was booked as income. In other words, it was an income item from the sale of a mutual fund product. No other case, whether it's Pacific Bank Corp. or Hatley, both cited by the commission, no other case deals with the issue of the alleged ill-gotten taking having an immediate and directly provable offset coming in. And that's why we propose to this Court that this Court has the power under Hatley, if not to remand to the commission for a consistent finding, certainly to take away the $280,000 of ill-gotten gain, alleged ill-gotten gain, plus pre-judgment interest. That's $440,000 off the commission. But what I'm trying to understand, it came back in, but it was spent on whatever was going on in the fund that WMS was doing, which I guess the commission found was for these other funds. And that was therefore not for — it was — that was for an improper purpose. And that's what — just as the overcapitalization was spent on these other funds, so was the money that came in. Well, Your Honor, I'm not going to quibble with your — your overall point is correct except they didn't trace what happened with that money. They — the money that came in. They simply said, well, all this did was prolong the life of this broker-dealer. And they — and I think the quote was, it said, they must have benefited one way or another. That's what the commission said in its brief to this Court. I think the Hatley decision requires more than just a sweep of the hand and saying, well, they probably did something else with it. Right. But let's assume we remanded on that issue. What would you expect to prove? Excuse me? If we remanded on that issue, what would you expect to prove? I mean, could you prove that it was — the expenses were — what were the expenses? Yes. The records of the operation of World Money Securities are all in the record. And I think we can go back and we can show, if those aren't, we can show by additional records exactly the good purposes of this — of this broker-dealer. This broker-dealer, by the way, was not void. It was not a wrongful broker-dealer. The commission never found that the fact that it existed was wrong or that it did anything wrong being a broker. It was owned by the mutual fund, it had a valid corporate life, and it had things it was going to do. Now, the commission has found, and we're not challenging, that while creating that company, the Respondents had ulterior motives. The commission said, well, they overreached. They loaded the broker-dealer up with things to help themselves. I'm not going to argue that that isn't the case. I can't. The commission's made the finding. I think that's supportable. But it doesn't mean you sweep $850,000 into the disgorgement amount. I think you can, at a minimum, take out the monies that came in. Looking at my time, I'm going to reserve some time, if I can, for rebuttal from the commission. If there are any other questions, I'm happy to. Scalia. No, no. We'll hear from you again in rebuttal. Roberts.  Thank you. Good morning. May it please the Court, my name is Christopher Pack, and I represent the Securities and Exchange Commission in this matter. May I ask you about the last statement of counsel? Is there any portion of the money that was put into this fund that this group, whatever you would call it, any portion that was put in that was spent for legitimate, valid purposes? Well, the record shows that there was expert testimony that the fund could have been capitalized to carry out the legitimate expenses. For $100,000. For $100,000. Legitimate expenses were, it was going to operate sort of, it was going to, they were going to save on commissions, basically. They were going to, the broker-dealer was going to execute transactions for the funds. And the expert testimony was, well, if you wanted to do this, you could put $100,000 in, and you could set up a broker-dealer that would in fact do that. And recognizing that fact, the commission said, well, we're not going to require disgorgement of the $100,000 that could legitimately have been used. We're only going to require disgorgement of the overcapitalization, the amount above and beyond what the testimony is. Now, that $100,000, would that have carried the operation forever, or just for the initial period? Well, supposedly, I don't know the answer to that. I believe that the operation was supposed to generate some revenues on its own, although in fact the only revenues it ever generated were these so-called trailing commissions. I simply don't, I don't know how long the period would have been. Because that raises the question in my mind, at least. So were these trailing commissions, were they properly used to continue the legitimate part, whatever the legitimate part is? We know $100,000 could be used for the legitimate part. But then after that was used up, maybe they were spending the trailing commissions for that purpose. I think ultimately the answer here is that the burden rests on the Petitioners to show that, in fact, the reasonable approximation the commission made by looking at the amount of overcapitalization, the burden is on Petitioners to show to, in fact, that the commission's reasonable approximation was not, in fact, reasonable, that there were other expenses that were legitimate. And there's simply nothing in the record at this point that the Petitioners simply haven't carried that burden, and that was their burden. All Petitioners say in their brief, and it's at page 17, they say most of the $150,000 was spent over a period of several years in the broker-dealer registration and filing costs, routine legal expenses, auditing expenses, and salaries. Now, that's simply not true. We know that approximately $400,000 was spent on marketing expenses, not when we say that most of the $150,000 was spent on these routine expenses. But, no, at least $400,000 was spent on marketing expenses, and there were also rent and some other business adventures. So my point is page 17 of their brief is the only place in this appellate record where the Petitioners even attempt to carry their burden of showing these commissions' approximation was not reasonable. And given that they haven't done that, I think what you'd be doing is you'd be saying, well, they haven't carried their burden. Let's go back and give them a second chance of carrying their burden. I suppose that's within the discretion of the Court, but I think that is not the normal mode of proceeding. Usually you say, well, one side gets its chance and the other side gets its chance and you make the record, and the record is what it is, and the case proceeds on that basis. This case has gone on for a long time, and Petitioners certainly have had an abundant opportunity to bring forward any argument to show that the trailing commissions were spent on legitimate expenses as opposed to illegitimate ones. So that is the commission's answer on that point. It is the burden of proof rests on the Petitioners under well-established law recognized in this circuit that the commission only has to show a reasonable approximation once the commission has made such a showing, the burden shifts to the Petitioners to show that it's not reasonable. But I gather you're conceding that in a hypothetical situation that overcapitalization isn't the be-all and end-all of the analysis, that in fact if trailing commissions were used for legitimate expenses, that could be part of the operating capital of the company that one would expect in a business plan, right? Yes. I mean, if such a showing had been made. My point is, I think in this case, that such a showing has not been made. I'd like to address a few of the points that counsel for Petitioners made. With regard to the amount of pre-judgment interest, the commission exercising its discretion has cut that amount in half over the descent of one of the Commissioners. Furthermore, during the lengthy course of proceedings in this case, Petitioners have had the use of the money. They've been able to use it for their own purposes. So it's entirely legitimate to require them to pay half of the pre-judgment interest calculated at the IRS underpayment rate. With regard to the issue of joint and serval liability, Petitioners were aware of this issue, the issue of Mr. Sturgey's health, before they filed their reply brief. It was not just a matter of they didn't just become aware of this issue once the commission rendered its decision to let things go with regard to Mr. Sturgey. They knew Mr. Sturgey raised this issue in a brief that he filed before Petitioners before Mr. Cox had filed his reply brief. They could have addressed it in that reply brief. They didn't. I think that's a clear case of a waiver. I would also, again, with regard to joint and serval liability, I would concede that an issue might be raised where the commission was viewed as having abused its discretion by having gone after some peripheral player or a small fish in a way that seemed manifestly unfair. That's certainly not the case here. Mr. Coxon was the prime mover of this operation, and the commission made such a finding at page 30 of its decision. If I may read that to you, it stated, Coxon enjoyed a close relationship with WMM and the fund and persuaded the fund shareholders and the independent directors to capitalize WMS and to obtain improper reimbursement of WMM's expenses. In addition to his ability to undertake business ventures, the record demonstrates that Coxon personally benefited from WMM's improved condition. Moreover, Coxon's income increased with salaries and fees. So I think when you have a situation where you have the main spring of the operation being required to pay a whole amount, that is very far from being any kind of abuse by the Commission. With regard to the 12b-1 issue, that is, the issue of whether certain expenses can be subject, legitimately subject to reimbursement under 12b-1, the Commission found the Commission declined to decide that issue. At page 18 of its decision, it says, because we find that WMM aided and abetted by Coxon and Surgey violated the terms of the advisory agreement, et cetera, we do not reach the Division's remaining allegations that Respondents thereby also aided and abetted and were causes of the fund's section 12b violations. And so what the Commission said basically is since we have misrepresentations here, we don't need to reach the further issue of whether even if this scheme had been represented accurately, it still would have been a violation. Now, the administrative law judge had made such findings, but the Commission said we don't need to reach that issue today because we have clear misrepresentations here that themselves are violations. With regard to the question of the accounting firm's doubts, ever since 1963, when the Supreme Court decided the case of SEC v. Capital Gains, Section 206-2 of the Investment Advisors Act has been read to require full and fair disclosure by an advisor to an investment company. And the Commission's position here was that Coxon and his cohort had been informed by the accounting — by their accountants that the treatment was aggressive, even though the accounting firm eventually signed off on the audit. And the Commission found that the full — 206-2 required, with its full and fair disclosure requirement, mandated that Coxon tell the Board, not just simply show them a copy of the audit, clean audit, but say, well, you know, the Board — the auditor did tell us this, even though he eventually signed off. And the Commission found that's a violation of 206-2. I think we've probably adequately covered the issue of trailing commissions. However, I would like to emphasize that certainly this money never came back to the shareholders. And I think that is — that is important to remember. Furthermore, even — The shareholders must have received some benefits from this operation. In terms of reduced commissions. That's possible, as, again, the record doesn't — doesn't show exactly what — what those benefits would have consisted of. And I think the burden was on the Petitioners to show what those benefits were. There's all — the Commission, furthermore, makes the argument that even if it could be shown that these expenses were legitimate, in a certain sense — I mean, expenses perhaps that reduced commissions to the — to the funds would have been legitimate. But other so-called legitimate expenses, registration expenses, attorney's fees, the cost of running the broker-dealer, I'm not sure that it's fair to characterize those expenses as legitimate, because those are ancillary expenses that are used to make it possible for Mr. Clarkson to funnel money from the profitable fund to the unprofitable funds. And he managed to, you know, send approximately $400,000 that way. In order to do that, he had to use further monies with which the broker-dealer had been capitalized to — to maintain compliance with the broker-dealer, pay salaries, attorney's fees, and so forth and so on. And I think those are ancillary expenses. It's not just the $400,000 that went directly to the marketing of the unprofitable funds, but also the ancillary expenses that were required in order to make it possible for him to do that. I think he's fairly charged with those, and fairly — it's fair to require him to disgorge that money. He had the use of that money, even though it didn't go straight into his pocket. Again, I'd like to — I'd like to conclude by stressing that there is no challenge here to the Commission's findings of the fact. The only challenge is to the sanctions. And the standard in — for this Court in considering the Commission's imposition of sanctions, of course, is abuse of discretion. I think in light of the Commission's broad equity — equity powers, and in light of the state of the record in this case, which unfortunately does not answer all the questions that we would like to have answered, I don't think that it can be said that the Commission abuses discretion. Thank you. Thank you, Your Honors. Briefly, there were a few points that I just wanted to respond to by my opposing counsel. First, if I heard him correctly, he seemed to suggest that more should be required than just giving the Board of Directors the audit — the clean audit report. And I take that to the next question, which reminds me of the question Judge Reinhart asked earlier today about the claim on the boat. You know, if a coil of rope falls over the boat, are we supposed to report that? If a member of the staff of the audit team, not the senior manager, not the audit report, make the comment the treatment of a particular expense is aggressive, does that have to be reported? At what point do those who run the funds have to decide every day what's a material comment and what's not? If it's not written up in the written audit report that's given to the Board of Directors, and one would think that with Ernst & Young, who, by the way, were the accountants here, if memory serves correctly, one would think that if there was a serious question about the use of proceeds or an accounting for an expense, it would be footnoted in the report, and it was not. Number two, the question of whether the commission declined or did not decide the issue of the 12B1 fees, I think is a little bit aside the point. They kind of avoided getting to it by saying, if I understand counsel correctly, well, we don't need to get to that because they violated the anti-fraud rule of the Investment Advisors Act because they didn't tell everyone that these fees were really not marketing fees. But to get to the question of whether they're marketing fees or not, we have to move from the anti-fraud rule of the Investment Advisors Act, Section 206A, over to 12B and look for guidance. 12B doesn't tell us that these fees are or are not appropriately considered marketing fees. Lastly, on the 400,000, I'm sorry, on the so-called overcapitalization, Your Honor asked, I believe it was Judge Reinhart who said, well, didn't this money belong to the shareholders? That's a very good point that I didn't emphasize, which is the broker dealer was not owned by the Respondents, not owned by any of them. It was owned by the mutual fund. It was owned by the permanent portfolio. Simply translated, when the trailing commissions came into it, the owner was the fund. The fund owned those monies. And I think that's an important distinction that should be emphasized. I thank the Court. Thank you, counsel.  Thank you both very much. This case, Judge, will be submitted.
judges: Lay , Reinhardt, Thomas